UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


FEDNAV, LIMITED,
CANADIAN FOREST NAVIGATION COMPANY, LIMITED,
NICHOLSON TERMINAL AND DOCK COMPANY,
THE SHIPPING FEDERATION OF CANADA,
THE AMERICAN GREAT LAKES PORTS ASSOCIATION,
SEAWAY GREAT LAKES TRADE ASSOCIATION,
THE UNITED STATES GREAT LAKES SHIPPING ASSOCIATION,
BAFFIN INVESTMENTS, LIMITED, and
CANFORNAV, INCORPORATED,

       Plaintiffs,

                                     Civil No. 07-11116
                                     Hon. John Feikens

       v.

STEVEN E. CHESTER, Director of the Michigan Department of
Environmental Quality, and
MICHAEL COX, Attorney General for the State of Michigan,

       Defendants,

and

MICHIGAN UNITED CONSERVATION CLUBS,
NATIONAL WILDLIFE FEDERATION,
ALLIANCE FOR THE GREAT LAKES, and
NATURAL RESOURCES DEFENSE COUNCIL, INC.,

       Intervenor-Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' AND
INTERVENOR-DEFENDANTS' MOTIONS TO DISMISS AND
DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs,[1] various international shipping entities, seek a declaratory judgment that Michigan's Ballast Water Statute, Mich. Comp. Laws § 324.3112(6), is invalid in general and as applied to these Plaintiffs. The Defendants named in the Complaint are Steven Chester, Director of the Michigan Department of Environmental Quality ("MDEQ"), and Michael Cox, Attorney General of Michigan, each sued in his official capacity. (Compl. ¶¶ 12 & 13.) Four environmental groups[2] have intervened as Defendants. Plaintiffs have brought a motion for summary judgment, and Defendants Chester and Cox, as well as Intervenor-Defendant NRDC, have brought motions to dismiss for failure to state a claim.[3] I hereby find that this Court lacks

---

[1]The Plaintiffs are:
• Fednav, Ltd. - a Canadian corporation headquartered in Canada,
• Canadian Forest Navigation Co., Ltd - a Canadian corporation headquartered in Canada,
• Nicholson Terminal & Dock Co. - a Michigan corporation headquartered in Michigan,
• The Shipping Federation of Canada - a non-profit Canadian association,
• The American Great Lakes Ports Ass'n - a non-profit association based in Washington, D.C.,
• Seaway Great Lakes Trade Ass'n - a non-profit association based in Michigan,
• The United States Great Lakes Shipping Ass'n - a non-profit association,
• Baffin Investments, Ltd. - a Barbadian corporation headquartered in Barbados, and
• Canfornav, Inc. - a Barbadian corporation headquartered in Barbados.

[2]The Intervenor-Defendants are
• Michigan United Conservation Clubs ("MUCC"),
• Alliance for the Great Lakes ("Alliance"),
• National Wildlife Federation ("NWF"), and
• Natural Resources Defense Council, Inc. ("NRDC").
MUCC, Alliance, and NWF together submitted one motion to intervene, while NRDC submitted a separate motion.

[3]Plaintiffs' motion for summary judgment is cited as "Pls. Mot. for Summ. J." Two responses to this motion for summary judgment were filed: one by Defendants Chester and Cox, and the other by all four Intervenor-Defendants. Unless otherwise noted, citations to "Def'ts Resp. Br. to Pls. Mot. for Summ. J." are to the Response Brief filed by Defendants Chester and Cox.
    The motions to dismiss are cited as "C & C Mot. to Dismiss" and "NRDC Mot. to Dismiss" for Defendants Chester and Cox's motion to dismiss and the NRDC's motion to dismiss, respectively.

jurisdiction over counts V, VI, and VII pursuant to the Eleventh Amendment and therefore

DISMISS them WITHOUT PREJUDICE, and that the remainder of Plaintiffs' counts fail to state

a claim for which relief can be granted, therefore I DISMISS them WITH PREJUDICE.

## I.     TECHNICAL BACKGROUND

Ballast is weight put into the hull of a ship to improve its stability at sea.  The American

Heritage Dictionary of the English Language 137 (4th ed. 2000) (first definition given).  Water is

a particularly useful form of ballast for ships that have great fluctuations in their weight, such as

cargo ships, so that the ship can easily add or remove ballast depending on how laden the ship is

with cargo.  (See Pls. Mot. for Summ. J. 4; Intervenor-Defendants Resp. to Pls. Mot. for Summ.

J. 3.)  If a ship uses water as ballast, dedicated tanks are placed in the hull of the ship in which

water can be added and from which it can be disposed.  (Pls. Mot. for Summ. J. 5.)

Aquatic Nuisance Species ("ANS") are "nonindigenous species that threaten[] the

diversity or abundance of native species or the ecological stability of infested waters, or

commercial, agricultural, aquacultural or recreational activities dependent on such waters."  16

U.S.C. § 4702(1).  It is undisputed by the parties that ANS are a problem throughout the United

States but particularly in the Great Lakes, where the introduction of several new species and

diseases have caused significant harm to several of the species naturally existing in the region.

(See Pls. Mot. for Summ. J. 5 & 27-28; C & C Mot. to Dismiss 1.)

All parties agree, and it is generally accepted, that ballast water is a primary avenue by

which ANS are introduced.  (Pls. Mot. for Summ. J. 5; C & C Mot. to Dismiss 1; NRDC Mot. to

Dismiss 6.)  Such introduction is made by a vessel sailing from a port at one point in the world

that takes on ballast in that port and discharges it in a port in a different part of the world, such as

the Great Lakes. In discharging that water, the vessel necessarily discharges any species

contained in the water. If these species are foreign to the ecosystem in which they are

discharged, they will either die off quickly or will flourish and alter their new ecosystem in the

process. This alteration is what makes them "nuisance" species. Examples of ANS introduced

into the Great Lakes include most famously the zebra mussel, believed to have been introduced

into this region by ships discharging ballast water. (See Def'ts Resp. Br. to Pls. Mot. for Summ.

J. 6.)

## II.    STATUTORY AND REGULATORY BACKGROUND

1.    Federal Law

    A.    *Federal Statutes*

    The federal government has statutes and regulations specifically addressing ballast

water.[4]  Congress addressed ANS in the Nonindigenous Aquatic Nuisance Prevention and

Control Act of 1990 ("NANPCA").  16 U.S.C. § 4701 et seq.  In this statute, it made several

---

[4]The Clean Water Act has been found to apply to ballast water, but it does not play a
direct role in this case. In 2005, Judge Illston of the Northern District of California found that
the EPA's failure to regulate ballast water as a pollutant under the Clean Water Act was contrary
to the clear intent of that statute despite the fact that the EPA had exempted ballast water from
regulation since 1973. Nw. Envtl. Advocates v. EPA, No. 03-05760, 2005 WL 756614, at *8-9
(N.D. Cal. Mar. 30, 2005). As a remedy, she granted the EPA two years to promulgate
regulations regarding the discharge of ballast water pursuant to the Clean Water Act. Nw. Envtl.
Advocates v. EPA, No. 03-05760, 2006 WL 2669042, at *1 (N.D. Cal. Sept. 18, 2006). On
September 30, 2008, approximately two years after imposing this remedy, she will vacate the
current regulation which states that ballast water is not a pollutant. Id. Thus, though there is
presently no federal regulation of ballast water by the EPA pursuant to the Clean Water Act that
this Court need consider, such regulation could exist in approximately a year. The EPA is
appealing Judge Illston's ruling, but has begun the process of soliciting comments for a
rulemaking. Development of Clean Water Act National Pollutant Discharge Elimination System
Permits for Discharges Incidental to the Normal Operation of Vessels, 72 Fed. Reg. 34241,
34241 (June 21, 2007).

findings regarding ANS introduction into the waters of the United States, including that "the discharge of untreated water in the ballast tanks of vessels" was a primary mode of introducing these species. 16 U.S.C. § 4701(1). Congress reauthorized NANPCA in 1996 with the National Invasive Species Act ("NISA") in which it made further findings, including that:

> [R]esolving the problems associated with aquatic nuisance species will require the participation and cooperation of the Federal Government and State governments, and investment in the development of prevention technologies.

16 U.S.C. § 4701(15). Originally NISA established only a voluntary program of ballast water management, recommending that ships conduct ballast water exchange outside of the United States Exclusive Economic Zone or "use environmentally sound alternative ballast water management methods ... if the Secretary determines that such alternative methods are at least as effective as ballast water exchange in preventing and controlling infestations of aquatic nuisance species." 16 U.S.C. § 4711(c)(2)(D). The statute further directed the Secretary who oversees the United States Coast Guard to "assess the compliance by vessels with the voluntary guidelines" within three years of the statute's enactment. 16 U.S.C. § 4711(e)(1)(A). If the Secretary found that compliance was insufficient, the statute required him to make the voluntary regulations mandatory. 16 U.S.C. § 4711 (f)(2)(A)(ii & iii). The Secretary of Homeland Security[5] found compliance insufficient in a report dated June 3, 2002, and a final rule indicating penalties for violating the guidelines was published June 14, 2004. Penalties for Non-Submission of Ballast Water Management Reports, 69 Fed. Reg. 32864 (June 14, 2004).

---

[5]The Coast Guard was part of the Department of Transportation until February 25, 2003, when it was moved to the Department of Homeland Security. See 6 U.S.C. § 542; see also United States Coast Guard: About Us, http://www.uscg.mil/top/about accessed on August 10, 2007.

NISA further contains a saving clause, which states:

All actions taken by Federal agencies in implementing the provisions of section 4722 of this title shall be consistent with all applicable Federal, State, and local environmental laws. Nothing in this chapter shall affect the authority of any State or political subdivision thereof to adopt or enforce control measures for aquatic nuisance species, or diminish or affect the jurisdiction of any State over species of fish and wildlife. Compliance with the control and eradication measure of any State or political subdivision thereof regarding aquatic nuisance species shall not relieve any person of the obligation to comply with the provisions of this subtitle.

16 U.S.C. § 4725. Section 4722 is entitled "Aquatic Nuisance Species Program" and explains among other things how the Aquatic Nuisance Species Task Force[6] ("Task Force") "shall develop and implement a program ... to prevent introduction and dispersal of aquatic nuisance species" into the United States. 16 U.S.C. § 4722(a).

### B. Federal Regulations

The Coast Guard presently mandates that "all vessels equipped with ballast water tanks bound for ports or places within the U.S." perform one of the following practices:[7]

(a) Prior to discharging ballast water in U.S. waters, perform complete ballast water exchange in an area no less than 200 nautical miles (nm) from any shore[,]
(b) Retain ballast water onboard the vessel[, or]
(c) Prior to the vessel entering U.S. waters, use an alternative environmentally sound method of [ballast water management] that has been approved by the Coast Guard.

---

[6]The Task Force consists of members of several federal agencies as well as representatives from groups such as the Great Lakes Commission. 16 U.S.C. § 4721(b) & (c). "Each Task Force member shall coordinate any action to carry out this subchapter with any such action by other members of the Task Force, and regional, State and local entities." 16 U.S.C. § 4721(f).

[7]There is a safety exception such that ships can discharge the minimum amount of ballast necessary without a mid-ocean exchange if the voyage never takes the vessel more than 200 nm from any coastline or if safety concerns of the vessel prohibit mid-ocean exchange, but the rule prohibits such discharge in the Great Lakes. 69 Fed. Reg. at 44953.

Mandatory Ballast Water Management Program for U.S. Waters, 69 Fed. Reg. 44952-01, 44953 (July 28, 2004) accessed at 2004 WL 1665882. The Coast Guard's theory regarding why complete ballast water exchange is an effective method of preventing the continued introduction of ANS is that the organisms most likely to survive in freshwater habitats such as the Great Lakes are those from fresh water, so if the tanks are flushed with salt water from the ocean in the middle of the voyage, this should kill most of the fresh water organisms that are present in the ballast tanks. Id. at 44953. For vessels that declare themselves to have no ballast onboard ("NOBOB"), the Coast Guard only recommends best management practices to rid ballast tanks of any residual ballast water and organisms. Ballast Water Management for Vessels Entering the Great Lakes That Declare No Ballast Onboard, 70 Fed. Reg. 51831-01, 51835 (Aug. 31, 2005) accessed at 2005 WL 2084103. This recommendation is to conduct saltwater flushing[8] a minimum of 200 nm from any shore to achieve a salinity of 30 parts per thousand (ppt) in its ballast tanks. Id. The Coast Guard is determining discharge standards for ballast water, but has not promulgated any to date. See 69 Fed. Reg. at 44955 ("[T]he Coast Guard intends to establish ballast water discharge standards that prevent the introduction of [ANS] and are both environmentally protective and economically feasible."); 70 Fed. Reg. at 51822.

---

[8]"Saltwater flushing" is defined as "the addition of mid-ocean water to empty ballast water tanks; the mixing of the flush water with residual water and sediment through the motion of the vessel; and the discharge of the mixed water, such that the resultant residual water remaining in the tank has as high a salinity as possible, and preferably is greater than 30 parts per thousand (ppt)." 70 Fed. Reg. at 51835.

2.     Michigan Law

     A.     *Michigan Statute*

     The principal statute at issue is Michigan's Ballast Water Statute.  It reads as follows:

Beginning January 1, 2007, all oceangoing vessels engaging in port operations in this state shall obtain a permit from [MDEQ or "the department"].  The department shall issue a permit for an oceangoing vessel only if the applicant can demonstrate that the oceangoing vessel will not discharge aquatic nuisance species or if the oceangoing vessel discharges ballast water or other waste or waste effluent, that the operator of the vessel will utilize environmentally sound technology and methods, as determined by the department, that can be used to prevent the discharge of aquatic nuisance species.  The department shall cooperate to the fullest extent practical with other Great Lakes basin states, the Canadian Great Lakes provinces, the Great Lakes panel on aquatic nuisance species, the Great Lakes fishery commission, the international joint commission, and the Great Lakes commission to ensure development of standards for the control of aquatic nuisance species that are broadly protective of the waters of the state and other natural resources.  Permit fees for permits under this subsection shall be assessed as provided in [Mich. Comp. Laws § 324.3120.]  The permit fees for an individual permit issued under this subsection shall be the fees specified in section 3120(1)(a) and (5)(a).  The permit fees for a general permit issued under this subsection shall be the fees specified in section 3120(1)(c) and (5)(b)(i).  Permits under this subsection shall be issued in accordance with the timelines provided in section 3120.  The department may promulgate rules to implement this subsection.

Mich. Comp. Laws § 324.3112(6).  The fees referred to in this statute for a general permit are

$75 to apply and $150 annually, and for an individual permit $750 to apply and $8700 annually.

See Mich. Comp. Laws § 324.3120.

     B.     *Michigan Regulations*

     MDEQ has promulgated rules pursuant to the Ballast Water Statute.  These rules provide

that an oceangoing vessel can sail into a Michigan port pursuant to a general permit if it either

certifies it will not discharge ballast water, or it agrees to discharge its ballast water only after

using one of the four MDEQ approved methods of treating ballast water: "(1) hypochlorite, (2)

chlorine dioxide, (3) ultra violet light radiation preceded by suspended solids removal, and (4)

deoxygenation." (See C & C Mot. to Dismiss 2 & 7.) If a vessel wishes to use another method to treat its ballast water before discharging it, it must apply for an individual permit from MDEQ. If MDEQ certifies that this method is as effective as the methods it has approved for the general permit, it will grant the individual permit. (See id.) MDEQ's approved methods have not been approved by the Coast Guard, (see Def'ts Resp. Br. to Pls. Mot. for Summ. J. Ex. 3,) and presumably MDEQ will not approve an individual permit that seeks to use mid-ocean exchange as the method of treatment, since Michigan's stated purpose in enacting this statute was to implement more effective methods of treatment than the Coast Guard currently enforces. (See C & C Mot. to Dismiss 1.)

## III. FACTUAL BACKGROUND

### 1. Facts Alleged in the Complaint

There are very few facts alleged in the Complaint. Plaintiffs, with one exception,[9] are either companies that own oceangoing vessels or are associations who represent owners of oceangoing vessels that are required by this statute to obtain permits from MDEQ if they wish to use Michigan ports. (Compl. ¶¶ 3-11.) They allege that "the overwhelming majority" of their oceangoing vessels "(a) do not discharge ballast water in the waters of the state of Michigan and (b) do not, in particular, discharge ballast waters containing aquatic invasive species." (Compl. ¶ 14.) The Complaint then recites the Ballast Water Statute and its penalties, and claims it is invalid pursuant to:

---

[9]The one exception is Nicholson Terminal & Dock Company, which operates a dock in Michigan. (Compl. ¶ 5.)

(1)     the Due Process Clause of the Fourteenth Amendment to the United States Constitution

        for "depriv[ing] [P]laintiffs of their property without due process of law," (Compl. ¶ 22,)

(2)     the Commerce Clause of the United States Constitution pursuant to the Dormant

        Commerce Clause doctrine because the statute "places unreasonable burdens on interstate

        commerce ... and is clearly excessive in relation to the putative local benefits gained,"

        and because it has a discriminatory effect upon ships registered outside of Michigan,

        (Compl. ¶ 24,)

(3)     the Supremacy Clause of the United States Constitution because Michigan's statute

        conflicts with United States Coast Guard regulations governing ballast water and because

        Congress intended to occupy this field, (Compl. ¶ 26,)

(4)     42 U.S.C. § 1983 because the statute violates Plaintiffs' due process rights under the

        United States Constitution and "rights arising from federal preemption of state law,"

        (Compl. ¶¶ 30-31,)[10]

(5)     the Due Process Clause of the Michigan Constitution for depriving Plaintiffs of their

        property without due process of law, (Compl. ¶ 33,)

(6)     the Title-Object Clause of the Michigan Constitution for imposing a tax without stating

        so clearly, (Compl. ¶¶ 36-37,) and

(7)     the Distinct Tax Clause of the Michigan Constitution for the same reason as Count VI.

        (Compl. ¶ 40.)

---

[10]As Section 1983 is only a jurisdictional vehicle for litigation of other rights, I do not
address this Count individually, but instead discuss it in the sections addressing the merits of the
Fourteenth Amendment and Preemption claims.

2.      Facts Attached to Motion for Summary Judgment

Few facts outside the requirements of the statute and corresponding regulations are introduced in the summary judgment briefing. Defendants introduce several reports and studies regarding the scope of the ANS problem in the Great Lakes. (See, e.g., Def'ts Resp. Br. to Pls. Mot. for Summ. J. 3-8 & Ex. A.) There is factual dispute between the parties regarding the effectiveness of the four methods the Ballast Water Statute permits shippers to use under the general permit. Plaintiffs assert there is no proof that these methods are as effective as the Coast Guard approved method of salt-water flushing, (Pls. Mot. for Summ. J. Ex. A ¶ 3,) while Defendants cite their analysis of reliable information regarding the effectiveness of these methods. (Def'ts Resp. Br. to Pls. Mot. for Summ. J. Ex. 2 ¶ 15.) There is no dispute that the Coast Guard has not approved any of Michigan's four approved methods of ballast water treatment. (Pls. Mot. for Summ. J. 3; Def'ts Resp. Br. to Pls. Mot. for Summ. J. Ex. C.) The parties further dispute the cost of implementing the treatment methods named in the statute: Plaintiffs assert it would cost approximately $1 million per ship, (Pls. Mot. for Summ. J. Ex. A ¶¶ 4-5,) while Defendants assert it would be no more than $500,000. (Def'ts Resp. Br. to Pls. Mot. for Summ. J. Ex. B ¶¶ 16-19.) Both parties agree that the majority of ships to whom this statute applies are "No Ballast On-Board" ("NOBOB") when they come to the Great Lakes.[11] (Pls. Mot. for Summ. J. 4-5; Def'ts Resp. Br. to Pls. Mot. for Summ. J. Ex. 2 ¶ 12.)

_____

[11]This is because most of these ships are delivering cargo to the ports in Michigan. (See Pls. Mot. for Summ. J. 4.) If a ship is loaded with cargo, it does not need to take on ballast water to stabilize itself; such water is only needed when the ship is not carrying enough weight. Thus a ship that is delivering cargo to a port is not discharging ballast water in that port, but taking on water as ballast for its outbound journey.

## IV.	PROCEDURAL BACKGROUND

After the Complaint was filed March 15th, Plaintiffs filed a motion for summary judgment on March 30th.[12]  On April 9th, Defendants filed a motion to dismiss for failure to state a claim.  Intervenor-Defendants filed motions to intervene on April 9th and April 10th which were granted on April 30th.  Intervenor-Defendant NRDC also filed a motion to dismiss for failure to state a claim on April 10th.  Further, a schedule regarding consideration of amicus briefs was announced to the parties; I accepted two and rejected two others which did not comply with the schedule.  Briefing was submitted for each motion, and oral argument was held for all motions on Thursday, July 12th.

## V.	STANDARDS OF REVIEW

<u>1.</u>	Motion to Dismiss for Failure to State a Claim

A motion brought pursuant to Rule 12(b)(6) should be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).  A court must "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief."  Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998).  The court need not, however, "accept as true legal conclusions or unwarranted factual inferences."  Id.  The Supreme Court recently addressed this standard, finding that to survive a

---

[12]This was filed too early, as twenty days had not passed since the Complaint was filed. Fed. R. Civ. P. 56(a).  The parties stipulated through a letter to the Court to permit Defendants to file their response to this motion as if the motion for summary judgment was filed on the first day it could have been filed pursuant to the rule.

motion to dismiss pursuant to Rule 12(b)(6) a plaintiff must "provide the grounds of his entitlement to relief [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. ___, 127 S. Ct. 1955, 1964-65 (2007); see also id. at 1968-69 (finding that standard in Conley v. Gibson, 355 U.S. 41 (1957), when literally applied permits more complaints to survive than the rule permits).

2.      Motion for Summary Judgment

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if proof of that fact would establish or refute one of the essential elements of a claim or defense and would affect the application of governing law to the rights and obligations of the parties.  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).  The court must view the evidence and any reasonable inferences drawn therefrom in a light most favorable to the nonmovant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  For a claim to survive summary judgment, the nonmovant must offer more than a mere scintilla of evidence as to the material facts.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  The movant's burden is satisfied where there is an absence of evidence to support the nonmovant's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

## VI. THE THREE STATE LAW CLAIMS MUST BE DISMISSED FOR LACK OF JURISDICTION

The three state law claims must be dismissed due to the Eleventh Amendment's limits on the jurisdiction of the federal courts. Plaintiffs claim the Ballast Water Statute violates (1) the Michigan Constitution's Due Process Clause, Mich. Const. art. I, § 17, (2) the Michigan Constitution's Title-Object Provision, Mich. Const. art. IV § 24, and (3) the Michigan Constitution's Distinct Tax Provision, Mich. Const. art. IV § 32. The law is clear that absent a state's consent, a state official may not be enjoined by a federal court on a state law claim. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 124-25 (1984); McNeilus Truck & Mfg., Inc. v. Ohio, 226 F.3d 429, 438 (6th Cir. 2000). There is no evidence that the state of Michigan has consented to these claims being heard in this Court; in fact, Defendants' have moved to dismiss these claims on jurisdictional grounds. (C & C Mot. to Dismiss 9-10.) Thus, these claims must be dismissed without prejudice for lack of jurisdiction.

## VII. THE REMAINDER OF THE CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM

1.  The Fourteenth Amendment Due Process Claim Must be Dismissed

Plaintiffs' claim under the Due Process Clause of the United States Constitution must be dismissed. Plaintiffs claim that "requir[ing] owners and operators of oceangoing vessels to procure permits to operate even if they do not discharge ballast water containing aquatic invasive species, by purporting to impose conflicting requirements with that of existing Michigan legislation, [and] fin[ing] persons who do not discharge ballast water for not having permits ... deprives [P]laintiffs of their property without due process of law." (Compl. ¶ 22.) Defendants argue this statute is properly analyzed under the rational basis test, and because there is clearly a

rational basis for this statute, no substantive due process claim can lie.[13]  The rational basis test is

the appropriate vehicle for analyzing this claim.  See Washington v. Glucksberg, 521 U.S. 702,

728 (1997).  This test accords state action of this sort "a strong presumption of validity."  Heller

v. Doe, 509 U.S. 312, 319 (1993).  The Supreme Court has described a court's duty in applying

the rational basis test as follows:

> [C]ourts are compelled under rational-basis review to accept a legislature's
> generalizations even when there is an imperfect fit between means and ends.  A
> classification does not fail rational-basis review because it is not made with mathematical
> nicety or because in practice it results in some inequality.  The problems of government
> are practical ones and may justify, if they do not require, rough accommodations –
> illogical, it may be, and unscientific.

Id. at 321 (internal citations omitted).

Plaintiffs fail to state a claim for a due process violation.  It was clearly rational for

Michigan to enact this statute.  The state is facing a serious threat to its environment caused by

ANS, has determined the likely avenues by which those species are being introduced, and has

taken measures to stop this introduction.  Plaintiffs's assertion that requiring ships that are not

discharging any ballast water in Michigan to obtain a permit violates the Fourteenth Amendment

misses the spirit of rational basis review; this Court will not unnecessarily alter the "rough

accommodations" a legislature uses to solve its polity's problems.  I find no constitutional

problem with a state implementing a permit scheme to protect its ports that requires payment of

fees by each entity that uses its ports, including from an entity that promises not to engage in the

---

[13]Defendants further argue that this claim fails to meet the requirements of Fed. R. Civ. P.
8 for failure to indicate if the claim is one of procedural due process or substantive due process.
(C & C Mot. to Dismiss 10.)  Although Plaintiffs fail to explicitly indicate which type of due
process violation they allege, it is obvious from the context that substantive due process is the
alleged violation.  Therefore, I analyze the claim as one for substantive due process.

activity that directly causes the ports harm.  Further, Plaintiffs' citation of <u>Uhl v. Ness City</u>, 406

F. Supp. 1012 (D. Kan. 1975),[14] is not persuasive on this issue.  As correctly noted by

Defendants, the court in <u>Uhl</u> found a substantive due process violation not because a person was

forced to pay for a service he did not want, but because depriving homes of water, an "absolute

necessity of life," was an overly oppressive manner of collecting fees for garbage removal.  <u>Id.</u> at

1018.  A comparison between depriving homes of water and requiring a fee to be paid to use the

ports of this state is almost laughable.  For each of these reasons, Plaintiffs have failed to state a

claim for violation of the due process clause.

<u>2.</u>        <u>The Preemption Claim Must be Dismissed</u>[15]

       I find Plaintiffs have failed to state a claim that the Ballast Water Statute is preempted by

federal law.  Pursuant to the Supremacy Clause of the United States Constitution, "the laws of

the United States ... shall be the supreme law of the land."  U.S. Const. art. VI, cl. 2.  If there is

no express statement of preemption by Congress, state law can be preempted by federal law in

two ways: (1) if the state law conflicts with federal law, or (2) if the federal government has

regulated an area so pervasively that it can be said that the federal law has occupied the field.

<u>See</u> <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. 363, 372-73 (2000).  I analyze each type of

preemption in turn.

_____

       [14]This case was affirmed on other grounds by the Tenth Circuit.  590 F.2d 839, 844 (10th
Cir. 1979).

       [15]Plaintiff alleges it brings this claim pursuant to 42 U.S.C. § 1983.  (Compl. ¶ 31.)  This
is impermissible.  <u>Golden State Transit Corp. v. City of Los Angeles</u>, 493 U.S. 103, 107-08
(1989).  However, it is undisputed that this Court has jurisdiction over this claim regardless.

A.    *The Statute is Not Invalid Pursuant to Field Preemption*

i.    *A Presumption of Validity is Inappropriate*

Preemption analysis, normally "'start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress,'" especially "in those [instances] in which Congress has 'legislated ... in a field which the States have traditionally occupied.'" <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 485 (1996) quoting <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947). However, "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." <u>United States v. Locke</u>, 529 U.S. 89, 108 (2000); <u>see also</u> <u>Hillsborough County v. Automated Med. Labs., Inc.</u>, 471 U.S. 707, 713 (1985) ("Pre-emption of a whole field also will be inferred where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'") quoting <u>Rice</u>, 331 U.S. at 230. Thus the first question in this analysis is whether this is an area in which there is a "history of significant federal presence." Plaintiffs argue this clearly is, as the statute applies to interstate and international maritime commerce, consistently considered throughout our nation's history as one of the strongest federal interests. (Pls. Resp. Br. to C & C Mot. to Dismiss 19; <u>see also</u> <u>The Federalist</u> Nos. 42, 12, 64.) Defendants argue that this is not, as the Ballast Water Statute is an environmental statute that affects commerce only in a tangential manner. (C & C Mot. to Dismiss 21-23.) Further, Defendants cite Supreme Court precedent in which a Detroit smoke ordinance was found not to be preempted when applied to a steamship that passed all Coast Guard inspections. <u>Huron Portland Cement Co. v. City of Detroit</u>, 326 U.S. 440 (1960).

I find Plaintiffs have the best of this argument. While Defendants' clearly are motivated to protect their local environment, it is clear that this statute strongly bears upon interstate and foreign maritime commerce. The Supreme Court's decision in <u>Huron Portland Cement</u> is distinguishable because the ordinance in that case was a law of general applicability that applied to all entities that emitted smoke in the City of Detroit. Michigan's statute directly regulates ships traveling from foreign lands by regulating what they are permitted to do with their ballast water; if the restriction was on any water emissions then the analogy to <u>Huron Portland Cement</u> would be more apt. The better comparison on this issue is to <u>Locke</u>, where a state passed rules governing oil tankers clearly meant to protect their local environment, and the Supreme Court found no presumption of non-preemption to apply. <u>See</u> <u>Locke</u>, 529 U.S. at 108. Further, the fact that in order to comply with the four methods in which ballast water may be discharged pursuant to Michigan's General Permit shipping companies must make changes to their vessels that will affect them outside of Michigan's borders further indicates this is statute significantly bears on interstate commerce. <u>See</u> <u>id.</u> at 112 ("Furthermore, a regulation within the State's residual powers will often be of limited extraterritorial effect, not requiring the tanker to modify its primary conduct outside the specific body of water purported to justify the local rule."). Thus, no presumption against preemption should exist.

<em>ii.     Congress Has Not Occupied this Field</em>

Even though the Ballast Water Statute does not enjoy the presumption of validity afforded most state statutes in a preemption analysis, it is clear that after analyzing the purposes of NISA and the interpretation given it by the United States Coast Guard that Congress has not occupied this field.

I find that NISA established concurrent jurisdiction by which the federal and state governments each address the problems of ANS, and therefore NISA cannot occupy the entire field of ANS control. NISA makes clear in its initial findings and purposes that "resolving the problems associated with aquatic nuisance species will require the participation and cooperation of the Federal Government and State governments." 16 U.S.C. § 4701(a)(15). The statute, in a section permitting states to submit plans to the Task Force for approval, permits the states to "identify any authority that the State ... does not have at the time of the development of the plan that may be necessary for the State ... to protect public health, property, and the environment from harm by aquatic nuisance species." 16 U.S.C. § 4724(a)(2)(C). If the states did not retain some authority to address the problems caused by ANS, this provision would make little sense. While the statute does contain several directives for international cooperation; see, e.g., 16 U.S.C. § 4711(i) (directing consultation with Canada, Mexico, and other countries to develop an effective international program to combat ANS); § 4711(j) (directing cooperation with UN and NAFTA commissions); § 4712(d) (directing Secretary to work with other countries through the International Maritime Organization ("IMO")); it also calls for cooperation among state and local governments within the United States. See, e.g., 16 U.S.C. § 4724(a)(3)(A) ("In developing and implementing a management plan, the State or interstate organization should, to the maximum extent practicable, involve local governments and regional entities, Indian tribes, and public and private organizations that have expertise in the control of aquatic nuisance species."); § 4721(c) (inviting members of state agencies to be ex officio members of the Task Force); § 4721(f) (directing Task Force members to "coordinate any action to carry out this subchapter with any such action by ... State ... entities."); § 4722(e)(1) (permitting Task Force to

19

develop cooperative control efforts in consultation with states).  Further, the statute specifically

references the Clean Water Act, 33 U.S.C. § 1251 et seq., in requiring that the guidelines shall

"not affect or supersede any requirements or prohibitions pertaining to the discharge of ballast

water into waters of the United States under" the Clean Water Act.  16 U.S.C. § 4711(c)(2)(J).

While at this time ballast water discharges are not regulated pursuant to the Clean Water Act,

because states can restrict water pollutants more stringently than the federal government

pursuant to the Clean Water Act, NISA's citation to it necessarily contemplates the possibility of

some disuniformity in ballast water regulation, and further indicates NISA's understanding of

the history of and tacit adoption of concurrent jurisdiction in clean water issues.  Last and most

important, the statute contains a saving clause that specifically preserves "the authority of any

State or political subdivision thereof to adopt or enforce control measures for aquatic nuisance

species, or diminish or affect the jurisdiction of any State over species of fish and wildlife."  16

U.S.C. § 4725.  The saving clause alone makes it difficult to comprehend that Congress intended

to occupy this entire field; if it so intended, then there would be no need to preserve the law of

any other jurisdiction since it would be preempted.  This alone is sufficient evidence of

Congress's clear intent to create concurrent regulation on ANS issues, but particularly in light of

the long history of concurrent regulation of environmental issues in legislation such as the Clean

Water Act it is clear that Congress intended concurrent regulation to address the ANS problem,

and not to exclusively occupy this field.

     Even if I were to find that NISA did not clearly contemplate and approve concurrent

jurisdiction between the federal and state governments in this area, there is at least doubt

regarding NISA's intent to occupy the field, and that doubt must be resolved in favor of the

states pursuant to the regulations promulgated by the United States Coast Guard.  The Coast

Guard, which is the agency charged with promulgating regulations pursuant to this statute, in

regulations published on June 14, 2004, July 28, 2004, and August 31, 2005 has made clear its

belief that for better or worse, states have the right to enact laws such as the Ballast Water

Statute.[16]  See Penalties for Non-Submission of Ballast Water Management Reports, 69 Fed.

Reg. 32864, 32868 (June 14, 2004); Mandatory Ballast Water Management Program for U.S.

Waters, 69 Fed. Reg. 44952-01, 44959 (July 28, 2004); Ballast Water Management for Vessels

Entering the Great Lakes That Declare No Ballast Onboard, 70 Fed. Reg. 51831-01, 51832 (Aug.

31, 2005).  Pursuant to the doctrine announced by the Supreme Court in Chevron v. Natural Res.

Def. Council, 467 U.S. 837 (1984), if Congress's intent in enacting this statute is not clear, the

view of the administrative agency charged with promulgating rules from the statute is adopted if

it is a "permissible construction of the statute."  Id. at 843; see also Medtronic, 518 U.S. at 496

(finding deference to agency's interpretation of statute regarding preemption to be proper);

Hillsborough County, 471 U.S. at 714-15.  While I find that Congress's intent is clear, I further

find that even if I failed to find clear intent for concurrent jurisdiction, the Coast Guard's

construction is a permissible construction of this statute, and therefore the Ballast Water Statute

cannot be invalidated under field preemption principles.

Plaintiffs' argument that the Supreme Court's decision in United States v. Locke, 529

U.S. 89 (2000), indicates that NISA preempts the Ballast Water Statute is incorrect.  In Locke,

---

[16]At one time the Coast Guard believed that federal law preempted any state regulation
on this issue, but this was stated in a regulation before NISA was enacted and is clearly no
longer the opinion of the Coast Guard.  See Ballast Water Management for Vessels Entering the
Great Lakes, 58 Fed. Reg. 18330-01, 18333 (Apr. 8, 1993).

the Supreme Court found that several of Washington's rules governing oil tankers were preempted by the federal regulatory scheme governing the tankers' design, specifically the Oil Pollution Act of 1990 ("OPA") and the Ports and Waterways Safety Act of 1972 ("PWSA"). <u>Id.</u> at 99-116. That case is distinguishable from this one for several reasons. First and most important is that NISA indisputably contemplates a role for states to play in the regulation of ANS issues where the statutes in <u>Locke</u> did not. The Court in <u>Locke</u> noted that the federal law specifically outlined uniform design requirements for oil tankers. <u>Id.</u> at 111 ("Title II of the PWSA covers 'design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning' of tanker vessels. Congress has left no room for state regulation of these matters.") (citations omitted). No such interest in uniformity is present in NISA. NISA does not mandate the same method of treatment for ballast water from all ships; in fact ,it permits alternative methods of treatment so long as they are deemed to be at least as effective as salt-water exchange.[17] <u>See, e.g.</u>, 16 U.S.C. § 4711(b)(2)(B). Second, while the design of a vessel often cannot comply with two sets of requirements, there is no reason to believe that ballast water management could not. As the United States Coast Guard has already announced to mariners, there are methods by which a vessel can comply with the federally approved method of ballast water management and the state approved method.[18] (<u>See</u> Def'ts Resp. Br. to Pls. Mot. for Summ. J. Ex. 3.) While this goes primarily to the conflict preemption

---

[17]While the regulations promulgated by the Coast Guard for ballast water are voluminous, much like those for oil tankers, the comprehensiveness of the federal regulations is not enough to find preemption. <u>Hillsborough County</u>, 471 U.S. at 716.

[18]This is also why Plaintiffs' counsel's argument that permitting the Ballast Water Statute to stand is equivalent to "throw[ing] the Coast Guard off the international vessels" is incorrect. (Tr. 7:8 - 9.) The Coast Guard remains on these vessels; it is merely joined by MDEQ.

argument, it also serves as evidence that the uniformity concerns in NISA are not as great as those in the OPA and PWSA. Third, the saving clause in NISA is a stronger ground on which to rely than was the saving clause in <u>Locke</u>, as it is in the same chapter as the substantive federal regulation. <u>See</u> 16 U.S.C. § 4701 <u>et seq.</u>; 16 U.S.C. § 4725. This indicates that a role for the states was forefront in the minds of the drafters of NISA. In <u>Locke</u>, the saving clause was discredited because it was located in the OPA while the regulation that preempted the state law was in the PWSA, a different statute passed almost a generation earlier. <u>Locke</u>, 529 U.S. at 106. For preemption purposes, where the intent of Congress is the touchstone, <u>see</u> <u>Nye v. CSX Transp.</u>, 437 F.3d 556, 560 (6th Cir. 2006), these reasons are sufficient to distinguish the finding of field preemption in <u>Locke</u> from this case.

Plaintiffs further argue that regulation of ballast water discharge should be the province of federal and not state law, and therefore the Ballast Water Statute must be preempted. (<u>See, e.g.</u>, Tr. 6:13-22.) They rely on storied documents in our nation's history for the importance of federal uniformity in issues such as interstate and foreign trade. (<u>See, e.g.</u>, Pls. Resp. Br. to C & C Mot. to Dismiss 19 citing <u>The Federalist</u>) The problem with this argument is not in any internal illogic, but instead that it is made to the wrong branch of government. It may be true that the detriment to the shipping industry of inconsistent regulations for ports in different states far outweighs any benefit to the environment that Michigan's statute provides. This is a policy decision that Congress must make, and ensuring that Congress has the power to make such a decision is precisely the victory for which the authors of the Federalist Papers advocated and won. In light of Congress's clear intent to permit states to pass laws such as this, and the federal executive branch's interpretation of this law, it is clear that no preemption exists. If Plaintiffs

and like-situated bodies want to make the policy argument that federal law should preempt all state regulation of ballast water management, they are free to do so before Congress. In the meantime, this Court refuses to invalidate a state statute by finding it preempted by a federal statute and regulations that encouraged this very sort of state regulation with no basis but Plaintiffs' arguments in political theory.

In light of this evidence, I find that Plaintiffs cannot state a claim that the Ballast Water statute is invalid pursuant to field preemption.

<em>B.      The Statute is Not Invalid Pursuant to Conflict Preemption</em>

Michigan's statute is not invalidated by the doctrine of conflict preemption. To find conflict preemption, I would have to find either that "compliance with both federal and state regulations is a physical impossibility," or that the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>Gibson v. American Bankers Ins. Co.</u>, 289 F.3d 943, 949 (6th Cir. 2002) (internal citations omitted). Because Plaintiffs allege no facts regarding impossibility, they fail to state a claim that dual compliance is impossible.[19] Regarding frustration of purpose, no party has argued that the purpose of NISA and NANCPA is anything but protecting the waters of the United States from ANS, so another method which is designed to protect these waters cannot frustrate the purpose of the federal law. There are only two findings I could make that would find conflict by the

---

[19]Further, it is possible to comply with both programs. For example, if a ship conducts a ballast water exchange pursuant to the federal regulations, and then further uses one of the four methods approved by the state of Michigan, the ship complies with the laws of both Michigan and the United States. (<u>See</u> Def'ts Resp. Br. to Pls. Mot. for Summ. J. Ex. 3 (memorandum from Coast Guard outlining liability under both Coast Guard regulations and Michigan law which shows it is possible to comply with both laws).)

second test: (1) that a purpose of NISA is to provide a uniform rule for foreign shippers, which I have already rejected in the above field preemption analysis, or (2) that a purpose of NISA is to ensure that the methods used to protect United States waters from ANS do not unduly burden the shipping industry, and no one has raised this argument nor do I see evidence of it in the statute.[20] Thus conflict preemption does not apply, and since I have already found field preemption does not apply I find Plaintiffs have failed to state a claim of preemption.

3.      The Commerce Clause Claims Must be Dismissed

        Plaintiffs have failed to state a claim for a violation of the Commerce Clause.  The doctrine of the Dormant Commerce Clause interprets the affirmative grant of power to regulate interstate and foreign commerce given to Congress in Article I as also imposing a negative restraint on the states from enacting statutes which unduly interfere with such commerce.  See Oregon Waste Sys., Inc. v. Dep't of Env. Quality, 511 U.S. 93, 98-99 (1994); see also Wyoming v. Oklahoma, 502 U.S. 437, 454-55 (1992).  States are not entirely prohibited from passing laws which affect interstate commerce; the Supreme Court has explained that:

> The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values.  As long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources.

Maine v. Taylor, 477 U.S. 131, 151 (1986) (internal citation omitted).  The Complaint alleges that the Ballast Water Statute violates the Commerce Clause because it has a discriminatory

---

[20]Plaintiffs do claim that Michigan's statute violates the Commerce Clause, but this is different from claiming that a purpose of NISA is to consider the economic impact of methods used to protect the waters, which would be necessary to invalidate Michigan's statute on a conflict preemption rationale.

effect borne by out-of-state shippers and because the burdens it places on those shippers are "clearly excessive in relation to the putative local benefits gained by the adoption and implementation of the Ballast Water Statute." (Compl. ¶ 24.) I address each claim in turn.

A.      *There is No Discriminatory Effect*

Plaintiffs fail to state a claim for a violation of the Commerce Clause due to express discrimination against out-of-state shippers. "A statute which has a discriminatory effect, for Commerce Clause purposes, is a statute which favors in-state economic interests while burdening out-of-state interests." <u>Eastern Ky. Res. v. Fiscal Court of Magoffin County</u>, 127 F.3d 532, 543 (6th Cir. 1997). Such statutes are subject to strict scrutiny. <u>Wyoming v. Oklahoma</u>, 502 U.S. at 454-55. Plaintiffs claim they have stated a claim by alleging "the only entities affected by the Ballast Water Statute are non-Michigan registered ships...." (Pls. Resp. Br. to NRDC Mot. to Dismiss 8 quoting Compl. ¶ 24.) Defendants and Intervenor-Defendants argue that this statute applies neutrally to all oceangoing ships regardless of their place of registration, and no constitutional issue arises simply because no oceangoing ships are registered in Michigan. (C & C Mot. to Dismiss 15-17, NRDC Mot. to Dismiss 8-10.) Defendants are correct. The statute by its very terms places mandatory obligations on <u>all</u> oceangoing ships that use Michigan ports. Mich. Comp. Laws § 324.3112(6). Such a neutral statute does not advantage vessels registered in Michigan as compared to those registered outside of the state. With no effect of favoritism towards intrastate businesses, there can be no discriminatory effect against interstate commerce, even if a burden exists. <u>See</u> <u>Exxon Corp. v. Maryland</u>, 437 U.S. 117, 125 (1978). Thus Plaintiffs have failed to state a claim for an express discriminatory effect on interstate commerce.

*B.*     *No Claim of Undue Burden is Stated*

Plaintiffs further fail to state a claim that the Ballast Water Statute violates the Commerce Clause by imposing an undue burden on interstate commerce.  The applicable test, most famously stated by the Supreme Court in <u>Pike v. Bruce Church, Inc.</u>, 397 U.S. 137, 142 (1970), is:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.  If a legitimate local purpose is found, then the question becomes one of degree.  And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

<u>Id.</u>  Since the burdens on ships are markedly different based on whether they are certified as NOBOB vessels or they discharge ballast water in Michigan waters, I address each type of vessel separately.

*i.*     *The Burden on NOBOB Vessels is De Minimis*

Plaintiffs cannot state a claim that the burden on NOBOB vessels violates the <u>Pike</u> test because the burden on those ships is <u>de minimis,</u> and therefore as a matter of law cannot clearly exceed the putative local benefits.  The Sixth Circuit recently found that a state's requirement that any wholesaler of prescription drugs within the state obtain a permit from the state for $100 per year was a minimal burden that could not outweigh the state's interest in regulating prescription drugs within its boundaries.  <u>Ferndale Labs., Inc. v. Cavendish</u>, 79 F.3d 488, 490-91 (6th Cir. 1996); <u>see also</u> <u>Doran v. Massachusetts Turnpike Auth.</u>, 348 F.3d 315, 322 (1st Cir. 2003) (finding requirements to pay $27.50 for an electrical device and to maintain an account balance of $10 to $20 to obtain partial refunds from Massachusetts Turnpike Authority were <u>de</u>

minimis).  For an oceangoing vessel to obtain a general permit from Michigan, which is all a

NOBOB vessel need obtain, the ship must pay a $75 application fee along with $150 annually,

as well as complete a three-page application.[21]  See Mich. Comp. Laws § 324.3120.  As was the

case in Ferndale Labs, this is a de minimis burden that cannot be clearly exceeded by any

rational state interest, and particularly not by the state interest of protecting natural resources for

which Michigan has enacted many statutes.  See generally Mich. Comp. Laws §§ 324.101 -

324.99904.  While it may be possible that Plaintiffs could show that the burden placed on

interstate commerce by this scheme outweighs any benefits to the state, they cannot show that

this de minimis burden clearly exceeds the putative local benefits.[22]  Thus, Plaintiffs have failed

to state a claim pursuant to Pike for any vessels who obtain a general permit.[23]

---

[21]The NOBOB vessels need not endure any further burden, such as installation of the technologies approved by MDEQ.  Vessels who discharge ballast water may, and they are discussed infra.

[22]Plaintiffs' citation of Defendant Cox's position in briefing before another Court in which he ascribed to the position that federal action is the only effective way to fully protect the states from ANS invasions is immaterial.  It is not inconsistent for the Defendants to believe that federal action of a certain type is the best way to address this issue, but in light of the federal government not taking the desired action some state action is better than nothing.  The sole issue before this Court is whether Michigan has the power to enact and enforce the Ballast Water Statute; whether any of the Defendants would prefer coordinated federal action to the potential "balkanization" caused by each state enacting its own environmental laws is irrelevant.

[23]Plaintiffs argue that because this issue requires a federal solution, the states should instead of passing their own laws lobby the federal government to propagate one federal standard that meets their satisfaction, and because Michigan has passed its own law instead of successfully lobbying the federal government to pass this law it has failed to minimize its impact on interstate commerce and therefore violates Pike.  (See Pls. Resp. Br. to C & C Mot. to Dismiss 15-16.)  This argument is untenable.  Michigan has no power to compel Congress or the Coast Guard to protect its interests.  This Court refuses to read the Pike test as requiring a state to lobby a separate sovereign body over which it has no control before it can enact laws governing its own sovereign territory.  If the state is able to pass laws that would protect the state's interest while creating less of a burden to interstate commerce, it should be required to do so pursuant to Pike, but a state is not required to wait patiently for actions by bodies that are out

ii.  *No Claim of Undue Burden Has Been Pleaded for Ships Who Discharge Ballast Water*

Although Plaintiffs argue in their briefing that provisions of the Ballast Water Statute regarding ships who discharge ballast water, whether pursuant to the general or individual permit, are invalid due to the dormant commerce clause doctrine, the Complaint fails to state such a claim.  Defendants argue that Plaintiffs have only claimed that the Ballast Water Statute violates the Commerce Clause when it requires NOBOB vessels to obtain a permit because the only burden identified by Plaintiffs in the Complaint is the permit fee for a NOBOB vessel and because the repeated theme in the Complaint is the perceived impropriety of requiring such vessels to obtain a permit when they do not discharge ballast water, or in Plaintiffs' words "not to do something they do not do."  (See C & C Mot. to Dismiss 18-19; NRDC Mot. to Dismiss 10.)  This latter point is raised eight times in the forty paragraph Complaint.  (Compl. ¶¶ 2, 14, 18, 20, 22, 33, 36, 40.)  Nowhere do Plaintiffs state the burden specifically caused by the treatment methods approved by Michigan in the General Permit.  Plaintiffs say it can reasonably be inferred from their Complaint that they challenge the entire machinery of the Ballast Water Statute, including the costs of utilizing the cleaning mechanisms approved by MDEQ in the General Permit.  (Pls. Resp. to C & C Mot. to Dismiss 13; Pls. Resp. to NRDC Mot. to Dismiss 9.)  Defendants again have the better of this argument.  The language used repeatedly in the Complaint is that the Plaintiffs have ships which "do not discharge ballast water containing aquatic invasive species."  (See Compl. ¶¶ 2, 14(b), 20.)  This is distinguished from Plaintiffs additional statement that many of its ships "do not discharge ballast waters into the waters of the

_____

of its control before exercising its own jurisdiction.

state of Michigan." (Compl. ¶ 14(a).) Plaintiffs at no point state, however, either that the statute violates the Commerce Clause for vessels that discharge their ballast water, or, for that matter, for NOBOB vessels; they merely allege that the statute violates the dormant commerce clause. In light of the consistent theme throughout this Complaint that the illegality of the Michigan statute was centered around the idea that Plaintiffs were forced to purchase a permit not to do something they already did not do, namely discharge ballast water, and in light of the fact that the only burden identified by the Plaintiffs in the Complaint is that a vessel must obtain a permit even if it does not discharge ballast waters, (see Compl. ¶ 18,) without some clear allegation that Plaintiffs are challenging the permitting scheme that regulates ships who do discharge ballast water, this Court refuses to find that Plaintiffs have stated such a claim. See Bell Atl. Corp. v. Twombly, 550 U.S. ___, 127 S. Ct. 1955, 1970-74 (2007) (finding Complaint failed to state a particular claim when only a few stray statements support that claim). Therefore, the dormant commerce clause challenge is analyzed only as the Ballast Water Statute affects NOBOB vessels, and this Court finds that Plaintiffs have failed to state a claim that there is a Commerce Clause violation regarding how vessels that discharge ballast water are regulated.[24]

---

[24]A finding that this statute violates the Commerce Clause would be particularly difficult to justify because Congress permitted the states to pass laws such as this as part of a cooperative scheme of environmental protection. (See supra § VI.3.) It must not be forgotten that the clause at issue is one whose text affirmatively grants Congress the power to regulate interstate commerce. U.S. Const. art. I cl. 8 s. 3. If a state passes a law to protect the environment in light of Congressional action that grants the state the right to pass such a law, it would be a bizarre result that the judge-made doctrine of the dormant commerce clause, created to ensure that Congress's power was not improperly encroached upon, would forbid Congress and the states from concurrently addressing a problem when both bodies determine that concurrent jurisdiction is necessary to accomplish their goal.

## VIII. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT MUST BE DENIED

In light of my finding that Plaintiffs have failed to state a claim upon which relief can be granted, it is unnecessary for me to conduct any substantive analysis of their motion for summary judgment. Instead, that motion is DENIED.

## IX. CONCLUSION

For the aforementioned reasons, I hereby find that this Court lacks jurisdiction to hear counts V, VI, and VII, and therefore I DISMISS those WITHOUT PREJUDICE, and that Plaintiffs fail to state a claim upon which relief can be granted on counts I, II, III, and IV, and therefore I DISMISS those WITH PREJUDICE.

**IT IS SO ORDERED.**

Date:    August 15, 2007                    s/John Feikens
                                            United States District Judge

| Proof of Service |
|---|
| I hereby certify that the foregoing order was served on the attorneys/parties of record on August 15, 2007, by U.S. first class mail or electronic means. |
| s/Carol Cohron |
| Case Manager |